JOSEPH W. COTCHETT (SBN 36324)
BRIAN DANITZ (SBN 247403)
GIA JUNG (SBN 340160)
CAROLINE YUEN (SBN 354388)
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcom Road
Burlingame, CA 94010
Tel: 650-697-6000
jcotchett@cpmlegal.com
bdanitz@cpmlegal.com
gjung@cpmlegal.com
cyuen@cpmlegal.com

LESLEY E. WEAVER (SBN 191305)
ANNE K. DAVIS (SBN 267090)
JOSHUA D. SAMRA (SBN 313050)
**BLEICHMAR FONTI & AULD LLP**
1330 Broadway, Suite 630
Oakland, CA 94612
Tel. (415) 445-4003
lweaver@bfalaw.com
adavis@bfalaw.com
jsamra@bfalaw.com

KARIN B. SWOPE (*pro hac vice* forthcoming)
THOMAS LOESER (SBN 202724)
ANDREW FULLER (*pro hac vice* forthcoming)
JACOB ALHADEFF (*pro hac vice* forthcoming)
**COTCHETT, PITRE & MCCARTHY, LLP**
1809 7th Avenue, Suite 1600
Seattle WA 98101
Tel: (206) 802-1272
kswope@cpmlegal.com
tloeser@cpmlegal.com
afuller@cpmlegal.com
jalhadeff@cpmlegal.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| TASHA ALEXANDER, an Individual on Behalf of Herself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> SALESFORCE, INC., <br><br> Defendant. | Case No. 3:25-cv-09560 <br><br> **CLASS ACTION COMPLAINT** <br><br> <u>**JURY TRIAL DEMANDED**</u> |

## **TABLE OF CONTENTS**

I.     INTRODUCTION ...........................................................................................................1

II.    PARTIES .....................................................................................................................4

       A.     Plaintiff ...........................................................................................................4

       B.     Defendant ........................................................................................................5

III.   JURISDICTION AND VENUE ...................................................................................5

IV.    DIVISIONAL ASSIGNMENT ....................................................................................5

V.     FACTUAL ALLEGATIONS .......................................................................................6

       A.     Generative AI Tools and the Training Process. ..............................................6

       B.     Salesforce Used Copyrighted Works to Train Its AI Models. ......................10

       C.     Salesforce's Actions Impaired the Market for Plaintiff's and Class Members' Works. ......................................................................................17

       D.     Salesforce's Piracy Is Not Fair Use. ............................................................18

VI.    CLASS ACTION ALLEGATIONS ...........................................................................22

VII.   CAUSES OF ACTION ..............................................................................................25

VIII.  PRAYER FOR RELIEF ............................................................................................26

IX.    DEMAND FOR TRIAL BY JURY ...........................................................................27

Plaintiff Tasha Alexander ("Plaintiff"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, brings this class action complaint against Salesforce Inc. ("Defendant").

## I.    INTRODUCTION

1.    Salesforce, despite being one of the world's most profitable companies, willfully infringed millions of registered copyrighted works to build its CodeGen[1] and xGen[2] Large Language Models ("LLMs") and commercial artificial intelligence ("AI") products, including Agentforce.

2.    Agentforce is a commercial Agentic AI Software product, offering customers AI agents "learn, adapt, and streamline workflows," powered by generative AI, and developed and maintained by Defendant Salesforce.

3.    Plaintiff and Class Members, authors who have copyright registrations for their works, bring this action under the Copyright Act to address harm from Salesforce's willful infringement. Salesforce downloaded pirated copies of their works, copied and stored these works, and used them to train its models to generate human-like text and images, which has and is displacing and diluting the market for Plaintiff's works.

4.    Salesforce did not seek permission or pay for the copyrighted works it uses, rather Salesforce willfully exploits the works without authorization to build and train its LLMs and power its Agentforce AI product.

5.    Authors invest years in creating these works, and intellectual property rights as old as our Constitution guarantee their right to compensation. Yet Salesforce disregards copyright protections, making large-scale infringement a core part of its business model for its LLMs and flagship Agentforce AI product.

---

[1] Erik Nijkamp et al., *CodeGen: An Open Large Language Model for Code with Multi-Turn Program Synthesis* (Feb. 27, 2023), https://arxiv.org/pdf/2203.13474.
[2] Erik Nijkamp et al., *Long Sequence Modeling with XGen: A 7B LLM Trained on 8K Input Sequence Length*, SALESFORCE BLOG (captured by Web Archive on June 28, 2023), https://web.archive.org/web/20230628183232/https://blog.salesforceairesearch.com/xgen/.

6.     Salesforce has committed significant capital and engineering expertise to developing LLMs to power Agentforce and to support Agentforce with infrastructure investments. Salesforce demonstrates its views that technology is a transformative innovation, by embedding its AI Models in its products, including Agentforce aiming to fundamentally enhance user experiences across its product ecosystem. With Agentforce, Salesforce aspires to avoid falling behind competitors that are going to market with LLM-powered AI Agent products and to drive substantial growth, adding trillions to its market capitalization in the years ahead.

7.     Despite the importance of Agentforce to its future growth, Salesforce has made no effort to compensate Plaintiff and Class Members and has taken steps to conceal the extent of its copyright infringement. Copyright law prohibits Salesforce's actions—downloading, storing, copying, and using hundreds of thousands of copyrighted books from bootlegged pirated sources.

8.     Salesforce undermines authors' livelihoods by offering Agentforce, enabling users to generate, freely or cheaply, texts writers would otherwise be paid to produce. These models, which erode the market for Plaintiff's and the Class's works, were built without compensating the authors on whom Salesforce relied, without authorization, for high quality training data.

9.     Salesforce has acknowledged that it used datasets such as RedPajama, C4, and PILE,[3] including datasets derived from Common Crawl, which are known to include shadow libraries of bootlegged copyrighted books including Books3[4] to train its LLMs.

10.     Large Language Models ("LLMs") take in user prompts and generate responsive content as output. LLMs powered generative AI products such as Salesforce's require vast amounts of high-quality data for training in order to provide high quality output in response to user prompts. The success of an LLM, such as Salesforce's xGen series of models, depends

---

[3] *Id.*; Janakiram MSV, *Salesforce Introduces xGen-7B, A Large Language Model With Longer Context Support*, FORBES (July 3, 2023); https://www.forbes.com/sites/janakirammsv/2023/07/03/salesforce-introduces-xgen-7b-a-large-language-model-with-longer-context-support/.

[4] *RedPajam-Data-1*, HUGGING FACE, https://huggingface.co/datasets/togethercomputer/RedPajama-Data-1T (last visited Nov. 5, 2025); https://www.together.ai/blog/redpajama-data-v2; *The Pile: An 800GB Dataset of Diverse Text for Language Modeling*, https://arxiv.org/pdf/2101.00027; Books3: https://x.com/theshawnn/status/1320282149329784833?lang=en.

heavily on the quality and contents of the datasets used for training, making copyrighted works an attractive source of high-quality, expressive content.

11.     Plaintiff and the Class are artists and authors who hold copyright protecting their works from unauthorized use. Plaintiff and the Class never authorized the use of their works by Salesforce for use in training any of the models powering Agentforce, including xGen models. Salesforce's unauthorized copying of the Plaintiff Works continues to harm Plaintiff through Salesforce's ongoing monetization of those works.

12.     Salesforce was able to develop Agentforce because of the Generative AI Models it built and trained on Plaintiff's copyrighted works without Plaintiff's license or authorization.

13.     By embedding Plaintiff's works into the LLMs powering Agentforce, Salesforce has irreversibly entangled Plaintiff's works with its commercial products, stripping Plaintiff of her exclusive rights under the Copyright Act to control the copying and distribution of the Plaintiff Works.

14.     This unauthorized copying and distribution inflicts immediate and irreparable harm on Plaintiff—harm that Salesforce compounds daily through its expanding deployment of Agentforce features embedded in Salesforce's products.

15.     It is no secret that the datasets Salesforce relied on to train the models powering Agentforce contained pirated and bootlegged copies of copyrighted works. Indeed, as attention to the use of copyrighted works in training generative AI models increased, Salesforce attempted to conceal its use of datasets known to include pirated works by removing specific references to RedPajama, C4, PILE, and Common Crawl disclosed in its June 2023 blog post announcing the launch of XGen and replacing that with reference to "publicly available sources" and "natural language content."[5]

---

[5]*Compare* Salesforce Blog, May 2, 2025, "xGen-small: Enterprise-ready Small Language Models," https://www.salesforce.com/blog/xgen-small-enterprise-ready-small-language-models/ *with* Erik Nijkamp et al., *Long Sequence Modeling with XGen: A 7B LLM Trained on 8K Input Sequence Length*, SALESFORCE BLOG (captured by Web Archive on June 28, 2023), https://web.archive.org/web/20230628183232/https://blog.salesforceairesearch.com/xgen/.

16.    In short, Salesforce copied Plaintiff's and the Class's copyrighted works to create a massive commercially valuable dataset and to train AI models that compete with and displace those works—without which Agentforce would be far less valuable. This has stripped Plaintiff of her rights and harmed the economic value of their labor, enabling Salesforce's unlawful commercial gain.

17.    It is commonly understood that "[m]any AI models are trained on copyrighted material without permission."[6] Salesforce's CEO Marc Benioff said at the World Economic forum in Davos Switzerland in January 2024 that "What is really important to these tech companies and how they operate is everybody's business. Our intellectual property, your stories, your work, surfacing in these results because ***all the training data has been stolen***". (emphasis added)[7] Benioff went on to say that "If you're going to use this data, I think probably there's a pretty great company to be built on a standardized set of training data that lets all these companies play a fair game and lets the content creators get paid fairly for their work." Salesforce should do just that—pay Plaintiff and the Class fairly for their work.

## II.    PARTIES

### A.    Plaintiff

18.    Plaintiff Tasha Alexander is an author who is the pseudonym of Anastasia Grant. She owns registered copyrights in multiple books which Defendant copied through direct downloading Books3 (the "Infringed Works").

| Title | Registration No. | Date |
|---|---|---|
| And Only to Deceive | TX0006269552 | 11/18/2005 |
| Tears of Pearl | TX0007040865 | 09/07/2009 |
| A Terrible Beauty | TX0008405890 | 04/21/2017 |

---

[6]    *Should AI Models Disclose Their Training Data?*, EDUWIK (Aug. 7, 2025), https://eduwik.com/should-ai-models-disclose-their-training-data/.

[7] https://www.youtube.com/watch?v=JSlniwSmBuI, as reported in The Street: *Marc Benioff: 'All the training data has been stolen'* (Jan. 17, 2024), https://www.thestreet.com/technology/marc-benioff-salesforce-sam-altman-chatgpt-openai-tech-companies-ai.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

B.      **Defendant**

19.     Defendant Salesforce, Inc. is a Delaware corporation with its principal place of business at 415 Mission St, 3rd Fl, San Francisco, CA 94105.

### III.      JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a), as this action arises under the Copyright Act of 1976, 17 U.S.C. § 101, *et seq.*

21.     The Court has personal jurisdiction over the Defendant because Salesforce is headquartered in San Francisco, California, which is located in this District, where substantial copyright infringement occurred, including downloading and reproducing the copyrighted works. Salesforce created the CodeGen and XGen series of large language models. Defendant distributes these models commercially. Therefore, a substantial part of the events giving rise to the claim occurred in this District. A substantial portion of the affected interstate trade and commerce were carried out in this District. Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. Defendant's conduct has had the intended and foreseeable effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

22.     The Court also has personal jurisdiction over the Defendant because the Defendant has purposefully availed itself of the privilege of conducting business within this District.

23.     Venue is proper under 28 U.S.C. §§ 1391(a) through (d) and 1400(a) because Salesforce's headquarters and principal place of business are located in San Francisco, California, which is located in this District, Salesforce resides in this District, and substantial parts of the events or omissions giving rise to the claims occurred in or emanated from this District, including, without limitation, decisions made by Salesforce's governance and management personnel.

### IV.      DIVISIONAL ASSIGNMENT

24.     Pursuant to Civil Local Rule 3-2(e), assignment to the San Francisco Division is proper because Salesforce is headquartered in San Francisco, California, and the facts that give

rise to this case occurred in San Francisco County. Under General Order No. 44, because this case concerns intellectual property rights, venue is proper in any courthouse in this District.

## V.    FACTUAL ALLEGATIONS

### A.    Generative AI Tools and the Training Process.

25.    AI is software designed to mimic human reasoning, creativity, or inference using algorithms based on statistical and mathematical models. Agentforce includes multiple LLMs and text-to-image diffusion models developed and commercialized by Salesforce. LLMs are AI software designed to generate natural, human-like text responses to user prompts while text-to-image models take a natural language descriptions to create corresponding visual images.

26.    Both LLMs and text-to-image diffusion models depend on large quantities of works, including those of Plaintiff and the Class. For example, even though Chat GPT 3 and 4 were built on the same general transformer framework, GPT-3 was trained on 175 million parameters and one-trillion words[8] while GPT-4 was trained on 1.76 trillion parameters and approximately ten-trillion words to substantially increase performance.[9] The same is true for image generation as the influential LAION-5B open source database released in 2022, was fourteen times larger than the prior open-source data base of image-text pairings.[10] These large databases of images are what the image generators are trained on and act as "the fuel for AI Art."[11] This fuel for AI is the copyrighted works of Plaintiff and the Class.

27.    The advancement of LLMs and image models has primarily been predicated on two major technical advancements, along with training on large quantities of high-quality data. LLMs were revolutionized by the transformer, the T in GPT ("Generative Pre-trained Transformer"), and text-to-image models were accelerated by diffusion.

---

[8] *GPT-3 vs. GPT-4*, GRAMMARLY, https://www.grammarly.com/blog/ai/gpt-3-vs-gpt-4/ (last visited Nov. 5, 2025).
[9] Nisha Arya, *GPT-4 Details Have Been Leaked!*, KDNUGGETS (July 19, 2023), https://www.kdnuggets.com/2023/07/gpt4-details-leaked.html.
[10] Romain Beaumont, Laion-5B: *A New Era of Open Large-Scale Multi-Model Datasets*, LAION (Mar. 31, 2022), https://laion.ai/blog/laion-5b/.
[11] *The Data Science Behind AI Art Generators*, THEDATASCIENTIST, https://thedatascientist.com/the-data-science-behind-ai-art-generators/ (last visited Nov. 5, 2025).

28.    In 2017, the transformer was introduced and provided the ability for LLMs to both process input sequences in parallel rather than sequentially and to weigh the importance of the different words or tokens within a section of text.[12] As transformer architecture progressed, developers began training their models on exponentially increasing volumes of text, which produced dramatically more effective responses. Roughly speaking, the progress of LLMs experienced over these past years has primarily been predicated on large quantities of valuable data and the transformer architecture.

29.    Similarly, diffusion models are at the heart of image-generation[13] as they are trained by iteratively adding Gaussian noise, randomness, to images and then progressively denoising the data, here, pixels in an image.[14] Like LLMs, training diffusion models on exponentially increasing quantities of valuable data dramatically increases the effectiveness of image generation. Generally, diffusion models trained on large volumes of quality data have been foundational for the recent advancement of image generation.

30.    These large databases of text, images, and text-image pairs are called the "training dataset" or "training corpus," which is what the LLM or the image or multi-model model learns from to generate the output. Salesforce's AI Models powering Agentforce also consist of at least a multi-modal Foundation Model, which allows the model to better comprehend representations across modalities, such as the word "cat" and the pixels of a "cat" in an image. These multiple modes of training and generation provide the model with deeper context that increases the model's effectiveness.

31.    A model is "pre-trained" when it copies and processes these texts or images to understand the statistical patterns, grammar, and relationships between words or relationships

---

[12] Jacob Uszkoreit, *Transformer: A Novel Neural Network Architecture for Language Understanding*, GOOGLE RESEARCH (Aug. 31, 2017), https://research.google/blog/transformer-a-novel-neural-network-architecture-for-language-understanding/.

[13] Sascha Kirch, *The Rise of Diffusion Models – A new Era of Generative Deep Learning*, SCALEUP:AI (Mar. 27, 2024), https://towardsdatascience.com/the-rise-of-diffusion-models-a-new-era-of-generative-deep-learning-3ef4779f6e1b-2/.

[14] *Introduction to diffusion models for machine learning*, SUPERANNOTATE (Feb. 28, 2025), https://www.superannotate.com/blog/diffusion-models.

between pixels. This pre-training provides developers with "weights" or "parameters," which are a large set of numbers uniquely derived from the training data to better predict the next word that should occur in a sequence.

32.    Once trained, the LLM uses its stored weights to generate natural language or image responses to user prompts. Each response is computed based on these weights, which imitates the protected expressions learned from the training data.

33.    Much of Salesforce's high quality training data consists of copyrighted works, including books, text, and images created by Plaintiff and the Class, ingested and copied without their consent, credit, or compensation.

34.    Stated otherwise, the training process consists of developers creating a "neural network"—a computational model that learns language patterns or the probabilistic assortment of pixel data from massive datasets.

35.    These models are called neural networks because they consist of interconnected nodes ("neurons") arranged in layers, loosely resembling the structure of the human brain.

36.    These "nodes" or "neurons" are the model's basic computational units, processing and transmitting fragments of information through the "brain" when the model performs a task.

37.    The neural network learns by reading huge amounts of text and images and by paying attention to how words are used together or how pixels are arranged in an image. Over time, the model picks up patterns in data and language, like grammar, meaning, and how ideas are connected without anyone having to program those rules by hand.

38.    Instead of being told what a sentence means, the model figures it out by studying lots of examples. As it learns, it builds a kind of mental map that shows how words and ideas relate to each other. This map is stored as numbers called "parameters." These numbers help the model understand, for example, that "dog" is more closely related to "puppy" than to "smartphone."

39.    Once the model is trained, it uses this knowledge to respond to people by answering questions, writing text, completing tasks, or generating images.

40.     Increasingly, artificial intelligence models are designed as multi-modal, here meaning that one single model is trained on both text and images. Salesforce's xGen line of models includes xGen-MM (also known as BLIP-3) that powers Agentforce and can understand both text and image data.[15]

41.     Agent force, like other AI model powered products, requires an enormous amount of data to function. This scale is essential for identifying patterns, generalizing across topics, and producing high-quality, creative outputs. Training the models that power such a product uses trillions of words and millions or billions of images, some of which involve an unlicensed registered copyright.

42.     Salesforce can measure its language training data in "tokens"—units of text that can represent a word, part of a word, or characters. On average, each word in the training data equals about 1.5 tokens.

43.     To train an effective LLM, the data must be diverse in both subject matter and style. Without variety, including both long- and short-form content, the model performs poorly and has limited understanding. Salesforce's training data includes a broad range of sources from datasets including scientific papers, code, and scraped web data. While books make up only a small portion compared to the much larger volumes of internet text and code, books, commonly recognized as high quality training data, are particularly important to effective LLM training.

44.     After assembling the training corpus, Salesforce processes the data by removing duplicates, converting text into tokens, and randomizing sequences to prevent memorization. Tokens are then transformed into "vectors," which mathematically represent word relationships. The model's weights and biases, initially random, are adjusted through vast numbers of calculations as it learns language patterns.

45.     This training creates a complex matrix capturing nuances like context (e.g., "bank" as a financial institution versus "bank" as a river edge), grammar, and word structure. The process transforms random vectors into rich, contextual representations of language. The final model

---

[15] Le Xue et al., *xGen-MM (BLIP-3): A Family of Open Large Multimodal Models* (Sep. 16, 2025), https://doi.org/10.48550/arXiv.2408.08872.

contains numerical values reflecting what it has learned but does not store or use the original training data once training is complete.

46.     A pretrained model can function as an LLM, but its output quality and task relevance can be improved through "fine-tuning." This secondary training phase focuses the model on specific goals.

47.     Inference is the process of using the LLM to generate outputs from user inputs such as spreadsheets, photos, or questions. Because the model is "probabilistic" rather than "deterministic," the same input may produce different outputs, and responses can't be precisely predicted.

48.     For the reasons stated below, much of Salesforce's high quality training data consists of copyrighted works, including books by Plaintiff and the Class, copied without their consent, credit, or compensation.

49.     For both the post- and pre-training processes in developing Agentforce, Salesforce created multiple, unlicensed copies of the training data. As the U.S. Patent and Trademark Office has observed, LLM "training" "almost by definition involve[s] the reproduction of entire works or substantial portions thereof."[16]

50.     In sum, Salesforce trained its generative-AI models for Agentforce using a vast data library that includes copyrighted works, such as books, text, and images created by Plaintiff and the Class, copied without author consent, credit, or compensation.

**B.     Salesforce Used Copyrighted Works to Train Its AI Models.**

51.     Salesforce released its CodeGen series of AI Models in March 2022.[17] At the time of its release, Salesforce disclosed that "[a]ll variants of CODEGEN are firstly pre-trained on the Pile."[18]

---

[16] U.S. Patent & Trademark Office, Public Views on Artificial Intelligence and Intellectual Property Policy 29 (2020), https://www.uspto.gov/sites/default/files/documents/USPTO_AI-Report_2020-10-07.pdf (last visited Nov. 5, 2025).

[17] Nijkamp, *supra* note 1.

[18] *Id.*

52.     Books3 is part of a separate AI training dataset called The Pile, curated by the research group EleutherAI. In December 2020, EleutherAI introduced The Pile in a paper titled "The Pile: An 800GB Dataset of Diverse Text for Language Modeling" ("The Pile Paper").[19] This paper describes the contents of Books3:

> "Books3 is a dataset of books derived from a copy of the contents of the Bibliotik private tracker … Bibliotik consists of a mix of fiction and nonfiction books and is almost an order of magnitude larger than our next largest book dataset … We included Bibliotik because books are invaluable for long-range context modeling research and coherent storytelling."

53.     Bibliotik is a well-known "shadow library." Collections of pirated books, such as Lib-Gen, Z-Library, and Bibliotik, are widely known to have circulated via the BitTorrent file-sharing network.[20] These sites have long been used by the AI training community for their vast collections of highly valuable texts, which include extensive unlicensed copyrighted material.

54.     Shawn Presser, who compiled the Books3 dataset, publicly confirmed that it is comprised of "all of Bibliotik" and includes approximately 196,640 books. These books in the Book3 dataset are stored as .txt files—a plain text format without formatting, fonts, or images— meaning the dataset contains the full text of all 196,640 books.[21]

---

[19] Leo Gao et al., *The Pile: An 800GB Dataset of Diverse Text for Language Modeling*, ELEUTHER AI (Dec. 31, 2020), https://arxiv.org/pdf/2101.00027 at 1.

[20] Alex Reisner, *Revealed: The Authors Whose Pirated Books are Powering Generative AI*, THE ATLANTIC (Aug. 19, 2023) https://www.theatlantic.com/technology/archive/2023/08/books3-ai-meta-llama-pirated-books/675063/ ("collections of pirated books, such as Library Genesis, Z-Library, and Bibliotik, that circulate via the BitTorrent file-sharing network.").

[21] Roger Montti, *Are ChatGPT, Bard and Dolly 2.0 Trained On Pirated Content?*, SEARCH ENGINE JOURNAL (Apr. 20, 2023), https://www.searchenginejournal.com/are-chatgpt-bard-and-dolly-2-0-trained-on-pirated-content/485089/ ("The Books3 dataset contains the text of books that were pirated and hosted at a pirate site called, bibliotic").

55.    Indeed, in an October 2020 Twitter thread, Presser explained Books3's creation.[22]



56.    Bibliotek, LibGen and Z-library were and are frequently seized by the FBI and international law enforcement partners, with prominent notices of seizure going up on the seized domains, replacing the searchable collections of pirated works, only for the shadow libraries to pop up on new domains.



57.    The Books3 dataset was available on Hugging Face until October 2023, when it was removed with a notice stating it was "defunct and no longer accessible due to reported

---

[22] *See* Shawn Pressor (@theshawwn), *Suppose you want to train a world-class GPT model, just like OpenAI*, TWITTER (Oct. 25, 2020, 1:32 AM), https://x.com/theshawwn/status/1320282149329784833?lang=en.

copyright infringement."[23] Shawn Presser, creator of Books3, admitted they "almost didn't release the data sets at all because of copyright concerns."[24]

58.    Salesforce's CodeGen AI Model was released before the Books3 dataset was removed from Hugging Face, meaning that Salesforce downloaded, copied, and used the version of the Pile containing Books3 and used it to develop and train its CodeGen series of LLMs.

59.    In June 2023, Salesforce first announced the release of xGen on its website as a state-of-the-art large language model.[25]

60.    The blog post announcing xGen states that the pre-training datasets includes a subset of the Pile, the RedPajama dataset, the C4 dataset (derived from Common Crawl).[26]

| Dataset name | Effective number of tokens (B) | Epochs | Sampling prop. (%) |
|---|---|---|---|
| RedPajama-CommonCrawl | 879.37 | 1 | 63.98 |
| RedPajama-GitHub | 62.44 | 1 | 4.54 |
| RedPajama-Books | 65.18 | 2.5 | 4.74 |
| RedPajama-ArXiv | 63.32 | 2 | 4.61 |
| RedPajama-StackExchange | 21.38 | 1 | 1.56 |
| C4 from 6 CC dumps | 191.5 | 0.2 | 13.93 |
| Wikipedia-English | 19.52 | 4 | 1.42 |
| Wikipedia-21 other languages | 62.04 | 2 | 4.51 |
| Pile_DM_Mathematics | 7.68 | 2 | 0.56 |
| Apex code from 6 CC dumps | 2.09 | 1 | 0.15 |
| **Total** | **1374.52** | | **100** |

61.    Salesforce also made available information about the sources of training data it used to train and develop xGen models on Github, where in June 2023, an employee responded to a request that Salesforce post the xGen training data by identifying RedPajama, C4, and the Pile as xGen model sources.[27]

---

[23]    *RedPajam-Data-1*, Hugging Face, https://huggingface.co/datasets/togethercomputer/ RedPajama-Data-1T (last visited Nov. 5, 2025).
[24]    Kate Knibbs, The Battle Over Books3 Could Change AI Forever (Sept. 4, 2023) https://www.wired.com/story/battle-over-books3/.
[25]    https://www.salesforce.com/blog/xgen/ (last visited Nov. 5, 2025).
[26]    Nijkamp, *supra* note 2.
[27]    Release of Training Data · Issue #3 · salesforce/xgen.

62.    Information about the RedPajama dataset is available on Hugging Face,[28] where it is hosted, which until taken down stated that the dataset's "Books" component is a copy of the "Books3 dataset;" "Books" is automatically downloaded from Hugging Face when assembling RedPajama. Thus, anyone who used the "Books" subset prior to April 2024 to train an AI model used a copy of Books3.

63.    Prior to October 2023, using the "Books" subset of the RedPajama dataset required copying the Books3 dataset. By using the "Books" subset, and thereby the full text of each book in Books3, Salesforce copied entire works to train its xGen models.[29]

64.    Salesforce's XGen models were thus trained on Books3, a known collection of pirated books, which included Plaintiff's and the Class's Infringed Works.

65.    EleutherAI's website encourages the public to download The Pile dataset from a website known as "The-Eye." Anyone who downloads The Pile from The-Eye is therefore also downloading a copy of Books3.

---

[28] *RedPajam-Data-1*, HUGGING FACE, https://huggingface.co/datasets/togethercomputer/ RedPajama-Data-1T (last visited Nov. 5, 2025) ("The 'book' config is defunct and no longer accessible due to reported copyright infringement for the Book3 dataset contained in this config.").

[29] Nijkamp, *supra* note 2.

CLASS ACTION COMPLAINT – 14
Case No. 3:25-cv-09560

66.     The Pile is also available for download from the "Hugging Face" website. Before October 2023, the Books3 subset of The Pile was available for download from Hugging Face as a standalone dataset. But in October 2023, the Books3 dataset was removed with a message that "The 'book' config is defunct and no longer accessible due to reported copyright infringement for the Book3 dataset contained in this config."[30].

67.     Books3 is also known to be a component of another dataset known as RedPajama which was created by Together AI and released in or around April 2023. RedPajama contained a subset of data called "Books" or "RedPajama-Books" that was actually a copy of "Books3 dataset." The RedPajama dataset is also available for download from Hugging Face. Before October 2023, the Books subset was "downloaded from Huggingface [sic]" when a user ran the script that automatically assembled the RedPajama dataset.[31] After the "Books3 dataset" was removed from Hugging Face in October 2023, the RedPajama dataset documentation also added a message that the 'book' config is defunct "due to reported copyright infringement for the Book3 dataset contained in this config."[32]

68.     But before October 2023, anyone who downloaded the Pile or RedPajama, or the Book config of either dataset, downloaded Books3.

69.     Pirated copyrighted works are also part of a dataset knows as C4. C4, created by Google in 2020, is a filtered version of the Common Crawl dataset.[33]

70.     Common Crawl is the largest freely available collection of web crawl data and one of the most important sources of pre-training data for large language models."[34] Its web archive

---

[30] *Dataset Card for RedPajama-Data-1T*, HUGGING FACE, https://web.archive.org/web/20240510231649/https:/huggingface.co/datasets/together computer/RedPajama-Data-1T.

[31] *Dataset Card for RedPajama-Data-1T*, HUGGING FACE, https://web.archive.org/web/20230420075601/https://huggingface.co/datasets/togethercomputer/RedPajama-Data-1T.

[32] *Dataset Card for RedPajama-Data-1T*, supra note 31.

[33] *Dataset Card for C4*, HUGGING FACE, https://huggingface.co/datasets/legacy-datasets/c4.

[34] Stefan Baack, A Critical Analysis of the Largest Source for Generative AI Training: Common Crawl at 1, MOZILLA FOUND. (June 3, 2024), https://facctconference.org/static/papers24/facct24-148.pdf.

consists of petabytes of data collected since 2008.[35] It completes crawls of the internet and releases its web archives generally every month.[36]

71.    C4 contains massive quantities of copyrighted materials, including like Books3, works found on piracy sites or nonconsenting digital libraries, and through subscription services.[37] For example, C4 contains data from "b-ok.org," a "notorious market for pirated e-books," as well as "[a]t least 27 other sites identified by the U.S. government as markets for piracy and counterfeits."[38]

72.    Even if Salesforce deletes Books3 and works sourced from pirated libraries from the dataset used to train xGen, its prior admitted reliance on the datasets makes certain that use of pirated books continues, as Books3 is already "deeply embedded in the very structure of the models' learned behaviors."[39]

73.    Given that Plaintiff's and the Class's Infringed Works are included in Books3 and pirated libraries including b-ok.org, Salesforce trained xGen on copies of these works, directly infringing the copyrights of Plaintiff and the Class.

---

[35] Rosanna Xia, *Tech Entrepreneur Gil Elbaz Made It Big in L.A.*, L.A. TIMES (February 5, 2012), https://www.latimes.com/business/la-xpm-2012-feb-05-la-fi-himi-elbaz-20120205-story.html.
[36] Statistics of Common Crawl Monthly Archives, COMMON CRAWL, https://commoncrawl.github.io/cccrawl-statistics/.
[37] Kevin Schaul, et. al., *Inside the Secret List of Websites that Make AI Like ChatGPT Sound Smart*, WASH. POST (April 19, 2023), https://www.washingtonpost.com/technology/interactive/2023/ai-chatbot-learning/.
[38] *Id.*
[39] *See* John Funge, *Machine Unlearning: The Lobotomization of LLMs*, DARKREADING, (Feb. 26, 2025), https://www.darkreading.com/vulnerabilities-threats/machine-unlearning-lobotomization-llms ("[D]eleting data from a trained LLM is more like trying to retrieve a whole strawberry from a smoothie. Once the data has been integrated into the model, it's no longer a discrete chunk — it's deeply embedded in the very structure of the model's learned behaviors.") (last visited Nov. 5, 2025); *see also* A. Feder Cooper et al., *Machine Unlearning Doesn't Do What You Think: Lessons for Generative AI Policy, Research, and Practice*, THE GEN CENTER ET AL. (Dec. 9, 2024) at 2, https://arxiv.org/pdf/2412.06966 ("Even if one removed all in-copyright images of Spiderman from a model's training data, this does not mean it would be impossible for the model to generate outputs that resemble Spiderman when put to use. Generative-AI models are impressive in part because they are able to generate novel outputs that transcend the information that is exactly contained in their training data. It is therefore a mistake to think that making a limited set of targeted changes to a model's parameters is sufficient to make promises about what types of out-puts that model could or could not possibly produce [].").

C.    **Salesforce's Actions Impaired the Market for Plaintiff's and Class Members' Works.**

74.    In order to train its AI models, Salesforce downloaded, and copied large quantities of copyrighted material—including unlawfully compiled datasets, including Books3—that encompass Plaintiff's works.

75.    Salesforce did not have permission from Plaintiff to use her copyrighted works nor did Salesforce pay Plaintiff for use of her works. In bypassing the proper licensing or purchase process, Salesforce has deprived Plaintiff of the revenues she would have realized through direct negotiations with Plaintiff or their authorized agents. Moreover, the creation of private libraries drawn from these illicitly assembled datasets for AI training purposes threatens to dilute or displace sales and harm the established market for access to Plaintiff's works.

76.    A growing body of publicly disclosed licensing arrangements reflects the emergence of structured markets for AI training data. Further, organizations have developed licensing systems, such as the Copyright Clearance Center's collective licensing framework and the Created by Humans platform, which aim to facilitate ethical and lawful access to copyright content for AI Development. Additionally, several dataset licensing entities have formed an industry consortium known as the Dataset Providers Alliance. The value of the AI training dataset market was estimated to be approximately $2.62 billion in 2024 and is projected to reach $18.47 billion in 2034.[40] These developments underscore the commercial significance of licensing copyrighted materials for AI training and the increasing recognition of the need for enforceable rights and transparent licensing practices.

77.    Furthermore, Salesforce has metered and unmetered Agentforce and Generative AI usage and billing with pricing ranging from "conversation-based" to per-user licensing for its Agentforce product.[41] Salesforce charges its users up to $500 for 100k credits, $2 per conversation, or offers unmetered access for its advanced artificial intelligence features to boost

---

[40] Press Release, Research and Markets, AI Training Dataset Market Report 2025: Market to Reach $18.47 Billion by 2034 from $2.6 Billion in 2024, E-Commerce Expansion and LLM Adoption, Despite Talent Shortage Risks (May 12, 2025).
[41] SALESFORCE, *Agentforce Pricing*, https://www.salesforce.com/ca/agentforce/pricing/ (last visited Nov. 5, 2025).

growth of its lucrative services business.[42] Agentforce and AI generally present Salesforce with massive business opportunities built upon the Infringed Works of Plaintiff and the Class.

78.     Salesforce's unauthorized use of Plaintiff's copyrighted works, has caused and continues to cause grievous harm to the market for Plaintiff's works. Plaintiff and Class Members license their work for commercial use. Salesforce's conduct undermines the emergence of lawful licensing regimes and has disrupted the market for Plaintiff's works by accessing and taking advantage of the unlawful pirating of such works. As a result, Plaintiff has faced and continues to face harms including, but not limited to, lost sales and recognition for their works.

79.     Salesforce trained its AI models on verbatim copies of Plaintiff's copyrighted works so that the products powered by the models can generate content that displaces the work that Plaintiff is paid to produce. This further diminishes the demand for books, text, visual art, and original, human-produced content.

**D.     Salesforce's Piracy Is Not Fair Use.**

80.     It is near impossible that "any accused infringer could ever meet its burden of explaining why downloading source copies from pirate sites *that it could have purchased or otherwise accessed lawfully* was itself reasonably necessary to any subsequent fair use." *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1025 (N.D. Cal. 2025).

81.     Defendant's verbatim copying of troves of copyrighted work to avoid compensating rights holders is not and cannot be fair use. The piracy that Defendant engaged in is infringement without a defense. It strains reason to believe that a defendant could satisfy the burden of fair use when stealing and copying at least thousands of copyrighted works, regardless of any subsequent use. Pirating otherwise purchasable works is copyright infringement.

82.     Salesforce's piracy was intended to build a central library that Defendant could have paid for, but chose not to. Salesforce did not copy from authorized purchased versions of copyrighted work, but instead downloaded thousands of unauthorized copies from a dataset that includes materials sourced from shadow libraries known to be from an illicit torrent used to

---

[42] *Id.*

CLASS ACTION COMPLAINT – 18
Case No. 3:25-cv-09560

1  indiscriminately hoover up countless copyrighted works for its centralized commercial database,

2  all with complete disregard to the rights of copyright holders.

3      83.    Salesforce, which touts itself as the technology company that values privacy and

4  security, used these copyrighted works not only to train xGen and power Agentforce, but also to

5  create a centralized library for any number of future purposes. Salesforce built this unauthorized

6  database as a substitute for paid copies of copyrighted works. Any subsequent use of this library,

7  such as to train an LLM, an image model, or its xLAM multi-modal models, is contingent and

8  necessarily predicated on the creation of this highly valuable centralized database. Creating this

9  library of copyrighted materials is its own use, is not transformative, and is indefensible

10 infringement.

11     84.    Moreover, any consideration for intermediate copying to later build an LLM is

12 undermined by Defendant's acts of piracy and by the fact that Defendant maintained its libraries

13 through multiple iterations of Salesforce's machine learning models. Defendant's use of

14 Plaintiff's works was not simply an intermediate step, but was a commercially exploitative end

15 unto itself. Arguments of intermediate copying cannot save Defendants because Plaintiff's works

16 "were acquired and retained, as a central library." *Id.* at 1026.

17     85.    The exploitation of Plaintiff's works was not indirect, it was and is a direct

18 download and scraping of the entirety of Plaintiff's works into a centralized database with no

19 transformation of form. Plaintiff's works were copied and maintained for future commercial

20 purposes. Defendants' copying was not transitory as Plaintiff's works were not immediately

21 destroyed, but were retained to train multiple of Salesforce's AI models, generating billions of

22 dollars for Salesforce. Salesforce's "piracy of otherwise available copies is inherently,

23 irredeemably infringing even if the pirated copies are immediately used for [a] transformative use

24 and immediately discarded." *Id.* at 1025.

25     86.    Piracy is piracy, but even if the court applies the statutory fair use factors to

26 Salesforce's unmitigated copying through downloading datasets including Books3 and other

27 pirated libraries such as C4, these factors weigh against fair use. The four factors of fair use are:

28 (1) "the purpose and character of the use," (2) "the nature of the copyrighted work," (3) "the

amount and substantiality of the portion used," and (4) "the effect of the use upon [Plaintiff's] potential market." 17 U.S.C. § 107.

87.    **Factor one.** The purpose and character of Salesforce's piracy is not a close call, as its use is strictly commercial and it is not transformative. The factor one analysis includes (1) whether the purpose of copying is commercial or non-commercial and (2) whether the purpose is transformative. Salesforce's piracy was and is not for educational or commentary purposes, but furthered a commercial endeavor to aggregate a massive library of valuable copyrighted works that helped add billions to Salesforce's market cap. Further, there is nothing transformative about pirating entire verbatim copies of Plaintiff's works to source free market substitutes for an unauthorized commercial database. Piracy is not transformative and is not fair use.

88.    **Factor two.** The factor two analysis primarily questions whether the nature of the copied work is more creative or factual, and secondarily questions whether the copied works are accessible or out of print. Plaintiff's works are highly creative and are therefore entitled to broader protections under copyright. Further, inaccessible works are provided less protection because there is no market for inaccessible works that a defendant's copying could displace. However, "this is not a case where source copies were unavailable," *Anthropic PBC*, 787 F. Supp. 3d at 1027, and Salesforce chose not to purchase or license this copyrighted material. The nature of Plaintiff's Infringed Works ensures Plaintiff the greatest copyright protection and narrows Defendant's argument for fair use.

89.    **Factor three.** The third factor asks whether a qualitatively and/or quantitatively substantial portion of Plaintiff's Infringed Works were stolen. The entirety of Plaintiff's Infringed Works was taken, verbatim reproduced, and stored for Salesforce's use on an ongoing basis. These works were not copied in a modified form, such as an image thumbnail, such that the substance was not taken; far more than small snippets of these books were copied. Plaintiff's Infringed Works were copied in their entirety to take both the whole and the heart of the work. The third factor weighs strongly in favor of infringement.

90.    **Factor four.** The harm to Plaintiff's market is clear as "[t]he copies used to build a central [training] library *and* that were obtained from pirated sources plainly displaced demand

1    for Authors' books — copy for copy." *Id.* at 1033. Factor four considers whether Salesforce's

2    actions displaced or diluted the market for Plaintiff's and the class's works. More accurately,

3    market displacement considers both whether the infringer's conduct itself causes harm or whether

4    widespread replication of the infringer's conduct would harm Plaintiff's market. At every turn,

5    Salesforce's conduct injures Plaintiff. Salesforce injures Plaintiff's market when downloading a

6    pirated library, when assembling this centralized database for ongoing commercial use, when

7    training its various LLMs, and through Agentforce, a product designed to replace human created

8    works.

9        91.    Salesforce's unauthorized Books3 and pirated library downloads displaced

10   Plaintiff's market through Defendant's own piracy. Widespread piracy inevitably leads to market

11   harm as it is difficult for creators that charge for their work, *i.e.*, through book sales and licensing,

12   to compete with free. Moreover, while merely pointing towards a theoretical licensing market is

13   insufficient, Salesforce has demonstrated that there is a thriving licensing market for Plaintiff's

14   Infringed Works as Salesforce has paid millions to rights holders it chose not to infringe upon.

15   Salesforce's individual actions have injured Plaintiff's market and widespread adoption of

16   Salesforce's tactics will only exacerbate this harm.

17       92.    Even when considering a subsequent purpose for Defendant's activity, training its

18   AI models, Plaintiff and the Class are severely injured. After Salesforce copies Plaintiff's

19   Infringed Works to train its models, these tools are then capable of generating functionally

20   limitless text and image content at an infinitesimal fraction of the time and cost. This makes AI

21   training unlike any preceding case of infringement as Salesforce then generates literally millions

22   of subsequent works that supplant Plaintiff's markets. Even if Defendant's outputs may not have

23   a statistically high likelihood of generating substantially similar copies of Plaintiff's Infringed

24   Works, Salesforce's Agentforce is designed to generate content previously produced by human

25   authors, flooding the market for sufficiently similar works that have a pronounced effect on

26   Plaintiff and the Class. This is not hypothetical or speculative, this substitution is presently

27

28

occurring as Class Members are already facing displacement due to Salesforce's infringement.[43] As the Supreme Court recently indicated, even if two works are not perfect substitutes, so long as market displacement would occur through widespread adoption of Defendants' copying, the infringement is unfair. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023).

93.     The purpose of copyright, since the beginning this country, is to incentivize original creativity. Salesforce's piracy and resultant AI models ensure that consumers can generate sufficiently superseding work in mere seconds. This displacement and dilution of the market for the works of Plaintiff and the Class severely disincentivizes their future creativity. Within the context of copyright's historic purpose, Salesforce's market displacement requires an adjudication that Salesforce's conduct is not fair use.

## VI.     CLASS ACTION ALLEGATIONS

94.     Plaintiff brings this action individually and on behalf of the Class, as defined below, pursuant to Rules 23(a), 23(b)(2) and 23(b)(3), of the Federal Rules of Civil Procedure:

> All legal or beneficial owners of a registered U.S. copyright in any work that has been or is being used by Salesforce in the compilation or creation of training datasets or in the training, research, or development of any of Salesforce's AI models during the Class Period. For purposes of this definition, copyrighted works are limited to those registered with the United States Copyright Office within five years of the work's publication before being trained on by Salesforce, or within three months of publication.

95.     Plaintiff reserves the right to amend the class definition and/or subclass definition. Certification of Plaintiff's claims for class wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

---

[43] Xiang Hui and Oren Reshef, *Is Generative AI a job killer? Evidence from the freelance market* (July 8, 2025), https://www.brookings.edu/articles/is-generative-ai-a-job-killer-evidence-from-the-freelance-market/ ("[F]reelancers in occupations more exposed to generative AI have experienced a 2% decline in the number of contracts and a 5% drop in earnings since the release of new AI software in 2022.").

96.    The "Class Period," as defined herein, extends from at least three years prior to the filing of this Complaint through the present.

97.    The Class excludes: (a) Defendant; (b) Defendant's parent companies, subsidiaries, and affiliates; (c) Defendant's officers, directors, management, employees, and agents; (d) all governmental entities; and (e) the judges assigned to this case, their chambers staff, and members of their immediate families.

98.    **Numerosity and Ascertainability:** The Class is comprised of thousands of authors and copyright holders, making joinder of all members impracticable. The identities of Class members can be readily determined from Defendant's business records and, at a minimum, from the contents of the datasets including Books3 and pirated library content such as RedPajama, Pile, and C4 that Salesforce unlawfully downloaded and copied.

99.    The Class is comprised of thousands of authors and copyright holders, making joinder of all members impracticable. The identities of Class members can be readily determined from Defendant's business records and from the contents of the RedPajama, Pile, and C4 datasets that Salesforce unlawfully downloaded, copied, and used.

100.    The Class is comprised of at least thousands of authors and copyright holders, making joinder of all members impracticable. The identities of Class members can be readily determined from Defendant's business records and, at a minimum, from the contents of the Books3 database that Salesforce unlawfully downloaded.

101.    **Commonality and Predominance:** This action involves common questions of law and fact which predominate over any question solely affecting individual Class members. These common questions include:

    a.    Whether Plaintiff's and Class Members' works were included in the training datasets Salesforce used to develop its XGen models and Agentforce product, including the RedPajama, Pile, and C4datasets;

    b.    Whether Salesforce's inclusion of Plaintiff's and Class Members' works in its training datasets constituted, or required, reproduction of those works by Salesforce;

c. Whether Salesforce reproduced Plaintiff's and Class Members' works without authorization;

d. Whether Salesforce infringed the copyrights of Plaintiff and Class Members by downloading and copying their Infringed Works and other copyrighted works and using them in the compilation of their training datasets;

e. Whether Salesforce infringed the copyrights of Plaintiff and Class Members by scraping or downloading their Infringed Works and other copyrighted works and using them in its XGen models or Agentforce product;

f. Whether the Court should enjoin Defendant from continuing the unlawful conduct alleged herein;

g. Whether any affirmative defense, including the fair use doctrine, excuses Defendant's conduct; and

h. Whether Salesforce's infringement was willful.

102. These common questions of law and fact predominate over questions that affect only individual Class members.

103. **Typicality:** Plaintiff's claims are typical of the other Class members' claims because all Class members were comparably injured through Defendant's substantially uniform misconduct, as described above. Plaintiff is advancing the same claims and legal theories on behalf of themselves and all other members of the Class that they represent, and there are no defenses that are unique to the Plaintiff. The claims of Plaintiff and Class members arise from the same operative facts and are based on the same legal theories.

104. **Adequacy:** Plaintiff will fairly and adequately represent and protect the interests of the Class, have no interests incompatible with the interests of the Class, and have retained counsel competent and experienced in class action litigation.

105. **Superiority:** Class treatment is superior to other options for resolution of the controversy because the relief sought for each Class Member is small, such that, absent representative litigation, it would be infeasible for Class Members to redress the wrongs done to them. Allowing the claims to proceed on a class basis will eliminate the possibility of repetitive

litigation. Defendant has acted on grounds applicable to the Class, thereby making appropriate final injunctive and declaratory relief concerning the Class as a whole.

106.    Risk of Prosecuting Separate Actions: Separate actions by individual Class Members would risk inconsistent adjudications and inefficiently consume limited judicial resources.

107.    Finally, at the very minimum, there are multiple common issues relating to Salesforce's uniform context, such as (but not limited to) their ingestion, reproduction, and willfulness.

### VII.    CAUSES OF ACTION

<u>COUNT ONE</u>
**DIRECT INFRINGEMENT**
**17 U.S.C. § 501**
**(On Behalf of the Plaintiff and the Nationwide Class)**

108.    Plaintiff reallege and incorporate by reference paragraphs 1–107 as if fully set forth herein.

109.    Plaintiff and members of the proposed Class created the original works and own the registered copyrights of those works that Salesforce copied and appropriated to train its artificial intelligence models.

110.    Plaintiff's and members of the proposed Class thus hold the exclusive rights, including the rights of reproduction, distribution, and the creation of derivative works under 17 U.S.C. § 106.

111.    Salesforce infringed and continues to infringe on Plaintiff's and Class Members' exclusive rights under 17 U.S.C. § 106 by reproducing the works owned by Plaintiff and Class Members to train its artificial intelligence models without permission, consent, or license.

112.    Salesforce copied works sourced from shadow libraries containing pirated or unlawfully acquired works, which infringed on Plaintiff's and Class Members' exclusive rights.

113.    On information and belief, Salesforce's conduct was and is willful because Salesforce is infringing on the exclusive rights of Plaintiff and Class Members knowing that the works are copyrighted and is profiting from mass copyright infringement.

114.    Salesforce's infringement has directly resulted and is directly causing ongoing monetary harm, including, but not limited to (1) lost licensing revenue that Plaintiff and Class members would have received had Salesforce properly obtained authorization and (2) loss of value to Plaintiff and Class Members works and portfolios due to Salesforce's mass infringement that has replaced and depressed the overall market for the Plaintiff's and Class Members' respective commercial markets.

115.    Plaintiff and Class Members are entitled to all remedies available under the Copyright Act, including, but not limited to, statutory damages, actual damages, injunctive relief, restitution of profits, disgorgement, and attorneys' fees and costs.

116.    Plaintiff and Class members have been and continue to be irreparably injured due to Salesforce's conduct. Salesforce will continue to infringe on Plaintiff and Class Members' exclusive rights unless its infringing activity is enjoined by this Court. Plaintiff and Class Members are thus entitled to permanent injunctive relief barring Salesforce's ongoing infringement.

## VIII.    PRAYER FOR RELIEF

117.    WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a)  For an Order certifying this action as a Class Action and appointing Plaintiff as Class Representative and her counsel as Class Counsel;

b)  For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein;

c)  For an award of actual damages, treble damages, compensatory damages, statutory damages, nominal damages, and/or statutory penalties in an amount to be determined, as allowable by law;

d)  For disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of their unlawful acts, omissions, and practices;

e)  For an award of punitive damages, as allowable by law;

f)   For an award of attorneys' fees, as allowable by law;

g)   Pre- and post-judgment interest on any amounts awarded; and

h)   Such other and further relief as this Court may deem just and proper.

## IX.        DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury of all issues so triable.


Dated: November 5, 2025                    **COTCHETT, PITRE & MCCARTHY, LLP**

By: */s/ Joseph W. Cotchett*
Joseph W. Cotchett, Cal. Bar No. 36324
Brian Danitz, Cal. Bar No. 247403
Gia Jung, Cal. Bar No. 340160
Caroline Yuen, Cal. Bar No. 354388
840 Malcom Road
Burlingame, CA 94010
Tel: 650-697-6000
Fax: 650-697-0577
jcotchett@cpmlegal.com
bdanitz@cpmlegal.com
gjung@cpmlegal.com
cyuen@cpmlegal.com

Karin B. Swope (*pro hac vice* to be filed)
Thomas E. Loeser, Cal. Bar No. 202724
Andrew Fuller (*pro hac vice* to be filed)
Jacob M. Alhadeff (*pro hac vice* to be filed)
1809 7th Ave., Ste. 1610
Seattle, WA 98101
Tel: (206) 802-1272
Fax: (206) 299-4184
kswope@cpmlegal.com
tloeser@cpmlegal.com
afuller@cpmlegal.com
jalhadeff@cpmlegal.com

**BLEICHMAR FONTI & AULD LLP**

By: */s/ Lesley E. Weaver*
Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267090)
Joshua D. Samra (SBN 313050)
1330 Broadway, Suite 630

Oakland, CA 94612
Tel. (415) 445-4003
lweaver@bfalaw.com
adavis@bfalaw.com
jsamra@bfalaw.com

*Counsel for Plaintiff*